UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MARK TRAHAN and** | § | |
| **PLACIDO DELGADO,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-11-2271** |
| | § | |
| **HONGHUA AMERICA, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Honghua America, LLC's ("Honghua America" or "Defendant") Motion for Summary Judgment ("Motion"). (Doc. No. 12.) After considering the Motion, all responses thereto, and the applicable law, the Court concludes that Defendant's Motion for Summary Judgment should be **DENIED**.

## I.      BACKGROUND

This is an action for unpaid overtime compensation brought under the Fair Labor Standards Act ("FLSA"). Honghua America is an American subsidiary of a Chinese company. (Doc. No. 12-5, Decl. of Stace Sherwood ¶ 3.) The company builds oil rigs used principally in land exploration for oil and gas. (*Id.*) Honghua America's principal place of business is in Houston, where it operates a fabrication and assembly shop, building oil rigs and rig components which are shipped around the world. (*Id.*; Doc. No. 12-4, Aff. of Estela V. Moscot ¶ 3.)

Stace Sherwood, the Senior Vice President of Sales and Operations for Honghua America, and Estela V. Moscot, the Human Resources Manager for Honghua America, explain that the work Honghua America performs is heavily customer-driven. (Doc. No. 12-5 ¶ 6; Doc. No. 12-4 ¶ 4.) Customer orders determine the amount of construction work available and the

specific skills Honghua America needs at any given time.  (Doc. No. 12-5 ¶ 6; Doc. No. 12-4 ¶¶ 4, 6.)  Because projects vary, Honghua America allegedly retains only a core group of workers as employees, and brings the remainder in as independent contractors to fill specific labor needs on given projects.  (Doc. No. 12-4 ¶ 5.)  These contractors sometimes work for just a few days, sometimes for weeks, and sometimes for several months.  (*Id.* ¶ 6.)  Honghua America contends that when individuals are hired as contractors, they all sign agreements stating that they are independent contactors.  (*Id.* ¶ 9.)  It further contends that all of its independent contractors are aware of the start and end date of all projects in which they work, because those dates are reiterated repeatedly in daily safety meetings.  (Doc. No. 19-1, Ex. A, Moscot Aff. ¶ 7.)  Furthermore, independent contactors are required to carry their own insurance.  (*Id.* ¶ 8; Doc. No. 12-4 ¶ 9.)  Contract workers submit invoices for the work they perform every week, and are allegedly paid based on their invoices.  (Doc. No. 12-4 ¶ 7.)  In recognition of the fact that they are highly skilled, temporary workers, Honghua America allegedly pays its rig welders higher than market rates.  (Doc. No. 12-4  ¶ 7; Doc. No. 12-5 ¶ 5.)

Defendant contends that Plaintiffs Mark Trahan and Placido Delgado (collectively "Plaintiffs") in this case were hired as two of the many independent contactors Honghua America brings on to perform work on an as-needed, project-driven basis.  (*Id.* ¶ 11.)  According to Defendant's records, Plaintiffs worked at Honghua America for about ten months, from June 2010 through April 2011.  (*Id.*; Doc. No. 12-3, Delgado and Trahan compensation spreadsheet.)  In support of its argument that Plaintiffs were not employees during this time, Defendant points out that Plaintiffs signed agreements that they were independent contractors.  (Doc. No. 12-2, Portions of Employee Records for Delgado and Trahan, at 3–4, 14.)  Plaintiffs also possessed liability insurance in their own name.  (*Id.* at 5, 10, 15.)  Defendant further notes that, throughout

the relevant time period, both Trahan and Delgado were certified to do specialized welding work and each had his own welding businesses.  (Doc. No. 12-4 ¶ 11; Doc. No. 12-2 at 1, 13.)  Finally, Defendant represents that Plaintiffs were required to bring their own welding equipment to work. (Doc. No. 12-4 ¶ 11.)

Plaintiffs tell a different story.  In their sworn affidavits, they contend they were hired as welders.  (Doc. No. 15-1, Aff. of Placido Delgado ¶ 1; Doc. No. 15-2, Aff. of Mark Trahan ¶ 1.) Although neither actually disputes signing an agreement to work as an independent contractor, both represent that they believed they were being hired as employees, and provide factual assertions in support their beliefs.  (Doc. No. 15-1 ¶¶ 1–3; Doc. No. 15-2 ¶¶ 1–3.)  Their affidavits, which are virtually identical, state that they were told their engagements would last at least six months, and likely for a couple years, because Honghua America had a lot of jobs lined up.  (Doc. No. 15-1 ¶ 2; Doc. No. 15-2 ¶ 2.)  They deny ever being told they were hired on a temporary basis or until the completion of a certain project.  (Doc. No. 15-1 ¶ 2; Doc. No. 15-2 ¶ 2.)  They also contend that they were provided with employee manuals, and required to sign confidentiality agreements, non-compete agreements promising that they would not compete against Defendant for two years after they stopped working at Honghua America, and several other agreements.  (Doc. No. 15-1 ¶¶ 1–3; Doc. No. 15-2 ¶¶ 1–3.)  They produce a copy of an employee manual, but they do not recall if they received copies of the agreements they allegedly signed.  (Doc. No. 15-1 ¶ 3; Doc. No. 15-2 ¶ 3.)  Plaintiffs also contend that Honghua America advised them it would not provide insurance, that they were required to obtain insurance, and that they should purchase insurance from a particular company.  (Doc. No. 15-1 ¶ 5; Doc. No. 15-2 ¶ 5.)  Finally, Plaintiffs represent that they were provided standard timesheets to fill out

their time, which they attach.  (Doc. No. 15-1 ¶ 4; Doc. No. 15-2 ¶ 4.)[1]  Plaintiffs allege they

worked for Honghua America for about eleven months, during which time they were not paid

overtime.  (Doc. No. 15-1 ¶¶ 1, 8; Doc. No. 15-2 ¶¶ 1, 8.)[2]  Honghua America paid Delgado an

unvarying rate of $35.00 per hour.  (Doc. No. 15-1 ¶ 8.)  Trahan was initially paid $35.00 per

hour, but his hourly rate was increased to $45.00 per hour before he left.  (Doc. No. 15-2 ¶ 1.)

Defendant vigorously disputes many of these assertions.  It states that, as with all

independent contractors, Plaintiffs were repeatedly told the start and end dates of their projects.

(Doc. No. 19-1, Ex. A ¶ 7.)  It also points out that Plaintiffs invoiced Honghua America for the

work they performed, and these invoices listed specific projects.  (*Id.* ¶ 9.)  Furthermore, it

represents that the human resources files for Plaintiffs do not contain any non-compete

agreements, that Honghua America did not require independent contractors to enter into non-

compete agreements, and that Honghua America had only a draft employee manual at the time,

which was never implemented or distributed.  (*Id.* ¶¶ 3–6.)  Finally, it denies ever directing

contactors to purchase insurance from a particular company, stating that contractors are expected

to use their own discretion in selecting an insurance carrier.  (*Id.* ¶ 8.)  Defendant does not

dispute, however, that Plaintiffs were paid an hourly rate of at least $35 per hour throughout their

engagement at Honghua America, and were not paid overtime.  (*Compare* Doc. No. 15-1 ¶ 8 *and*

Doc. No. 15-2 ¶ 1 *with* Doc. No. 12-3.)

The parties also disagree about the work Plaintiffs performed.  Defendant describes

Plaintiffs as skilled rig welders who occupied supervisory roles at Honghua America.  (Doc. No.

---

[1] It should be noted that these alleged timesheets are labeled "invoices."  (Doc. No. 15-1, Delgado timesheets/invoices; Doc. No. 15-2 Trahan timesheets/invoices.)

[2] Plaintiffs state that they worked for Honghua America for a slightly longer time period than that provided by Honghua America.  (*Compare* Doc. No. 15-1 ¶ 3 *and* Doc. No. 15-2 ¶ 3 *with* Doc. No. 12-4 ¶ 11 *and* Doc. No. 12-3.)  The Court cannot say whether Plaintiffs' affidavits are merely imprecise, or whether they actually disagree with the records produced by Honghua America.  The timesheets/invoices Plaintiffs provide are of no help because they are too blurry to read.

12-4 ¶ 11.)[3]   Indeed, it claims that Plaintiffs were among the most skilled out of about 100 independent contractors employed by Honghua America at any given time.  (Doc. No. 19-1, Ex. B, Aff. of Dameng Zhang ¶ 2.)   Due to their level of skill, they did not perform the routine manual work low-level welders typically performed; rather, the communicated with customers, modified projects as necessary, and directed, trained and supervised less skilled contractors.  (*Id.* ¶¶ 3–5.)  They answered to only the Fabrication Manager, a full-time employee of Honghua America. (*Id.* ¶ 2.)

Plaintiffs provide a rather different description of their responsibilities.  They claim that that Honghua America managed every significant aspect of their job, directing them some days to perform welding work, and other days, to perform the work of a fitter.  (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)  They describe their work, as both fitters and welders, to be manual in nature: lifting parts and equipment, frequently using power tools, and welding, cutting, assembling, and fitting component parts together.  (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)   According to Plaintiffs, this work required no special skill or initiative because Honghua America provided a set of plans for welding projects and because the manager or foreman supervised their work and made sure they were making proper welds.  (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)  Plaintiffs also allege Honghua America required them to work from 7:00 a.m. to 7:00 p.m. every day, and advanced approval was required to take a day off.  (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.) Plaintiffs represent that they did not work for anyone else during this time period, and were not in business for themselves.  (Doc. No. 15-1 ¶ 7; Doc. No. 15-2 ¶ 7.)  Plaintiffs also indicate that Honghua America provided them with all of the tools and equipment they needed to do their jobs. (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)

---

[3] However, the records produced by Defendant reflect that Trahan, at least, also worked as a fitter and a steel fabrication foreman.  (Doc. No. 12-2 at 20–21.)

Defendant has now filed a Motion for Summary Judgment on Plaintiffs' claims.  (*See generally* Doc. No. 12.)  Specifically, it argues that summary judgment is appropriate because 1) Plaintiffs are not employees within the meaning of the FLSA, and, 2) even if they are employees, they are exempt as highly compensated employees.  The Court now turns to this Motion.

## II.    LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  *Id.*  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party."  *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).  Courts may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Liquid Air Corp.*, 37 F.3d at

1075 (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Liquid Air Corp.*, 37 F.3d at 1076 (citation omitted) (internal quotation marks omitted).  A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts.  *Id.* at 1075.

### III.   ANALYSIS

"The FLSA requires covered employers to pay nonexempt employees at not less than the minimum wage and at one and one-half times their regular rate for all hours worked in excess of forty (40) during a workweek."  *Floridia v. DLT 3 Girls, Inc.*, No. 4:11–cv–3624, 2013 WL 127448, at *2 (S.D. Tex. Jan. 9, 2013) (citing 29 U.S.C. §§ 206(a)(1), 207(a)(1)).   Section 216 provides a right of action for employees against employers who violate §§ 206 and 207.  Plaintiffs allege that Honghua America failed to pay them overtime wages for hours worked above forty throughout their time at Honghua America, in violation of 29 U.S.C. § 207.  (Doc. No. 15 at 1.)

#### A.   Employee or Independent Contractor

Honghua America argues that Plaintiffs are not owed overtime compensation because they were independent contractors, not employees.  (Doc. No. 12 at 5–16.)  The FLSA includes an expansive definition of who qualifies as an employee.  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, (1992) (The FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (citations omitted).

To determine if an individual is an employee under the FLSA, the Fifth Circuit considers whether, "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."   *Hopkins*, 545 F.3d at 343 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)).   As part of this inquiry, courts look to five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.   *Id.*   No single factor is determinative.   *Id.* (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987)).   The ultimate determination of status is a question of law based on underlying findings of fact.   *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1225–26 (5th Cir. 1990) (citations omitted); *Mr. W Fireworks*, 814 F.2d at 1045.   When the facts that bear on the employee status factors are disputed, summary judgment is inappropriate.   *Lang v. DirecTV, Inc.*, 801 F. Supp. 2d 532, 538–40 (E.D. La. 2011); *Tran v. Thai*, No. H–08–3650, 2010 WL 5232944 at *5 (S.D. Tex. Dec. 16, 2010); *Heidingsfelder v. Burk Brokerage, LLC*, No. 09–3920, 2010 WL 4364599, at *2–3 (E.D. La. Oct. 25, 2010).

This is not the first time courts in this circuit have had to determine whether welders are employees or independent contractors for the purposes of the FLSA.   *See Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (finding welders to be independent contractors); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (finding welders to be employees).   *Carrell* did not overrule *Robicheaux*, but rather recognized that some welders may be employees, and others independent contractors depending on the application of the above factors.   *See Carrell*, 998 F.2d at 334 (discussing *Robicheaux* and noting that the welders in

*Carrell* were independent contractors because several of the factors present in *Robicheaux* were not present in *Carrell*). More recently, the Fifth Circuit has decided a number of cases involving cable splicers, which relied heavily on *Carrell* and *Robicheaux*, and which further reinforce the fact that there can be no bright line rule in these situations. *See Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 849 (5th Cir. 2010) (finding splicer to be independent contractor); *Lindsley v. BellSouth Telecomms. Inc.*, 401 F. App'x 944, 946 (5th Cir. 2010) (finding splicer to be independent contractor); *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) (vacating district court's finding of independent contractor status and remanding for further proceedings). While the fact-intensive nature of the employee status inquiry requires this Court to consider carefully the facts of the relationship before it, the Court pays particular attention to how the Fifth Circuit made its ultimate legal determination of status in the above cases.

### 1.    Degree of Control

Degree of control refers to whether the plaintiff possesses "real independence" in the economic relationship. *Hopkins*, 545 F.3d at 343. The Fifth Circuit has recognized that "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Id.* (citing *Mr. W Fireworks*, 814 F.2d at 1049); *see also Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995). In analyzing this factor, the Fifth Circuit has previously considered the extent to which an alleged employer directs, oversees, or manages how a worker performs his tasks. *See Thibault*, 612 F.3d at 846–47 (considering, in analyzing degree of control, the fact that the defendant determined the work hours and breaks splicer would get, but not the manner and method by which the plaintiff was to do his splicing); *Carrell*, 998 F.2d at 332–33 (discussing competing

9

facts relevant to degree of control determination, including that the defendant assigned specific welding work to the plaintiffs, and set their hours, but customers tested and certified each welder, and welders placed their identification on each weld so that the customer could determine who was responsible for improper welds); *Robicheaux*, 697 F.2d at 664 (recognizing that the defendant exercised "substantial if not complete control over the hours worked and the jobs done by the welders"); *Cromwell*, 348 F. App'x at 58–59 (noting that the defendant provided descriptions of the work needed and certain general specifications, and checked on the progress of the work, but did not train the plaintiffs or control the details of how their tasks would be completed). However, "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Hopkins*, 545 F.3d at 343 (citing *Mr. W Fireworks*, 814 F.2d at 1049).

Here, substantial factual disputes exist precluding the Court from determining whether the degree of control factor weighs in favor of employee status or independent contractor status. The parties tell a very different story as to how much control Plaintiffs exercised over their work. Plaintiffs' sworn testimony provides that Defendant determined what work they would perform any given day, and a manager oversaw their work to make sure they were making proper welds. (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.) Defendant, in contrast, provides sworn testimony from a Human Resources employee that Plaintiffs rarely performed any manual tasks, and instead worked with customers to make changes to projects as needed, and oversaw less skilled welders. (Doc. No. 19-1, Ex. B ¶¶ 3–5.) The Court cannot make credibility determinations, and must view the facts in favor of the non-moving party. *Reeves*, 530 U.S. at 150; *Nichols*, 495 F.3d at 188. If Plaintiffs can prove that they were closely monitored in how they did their work, and that Defendant controlled their work assignments, these facts would weigh against finding that

10

Plaintiffs exerted the sort of meaningful control as to constitute a seprate economic entity.  *See*

*Carrell*, 998 F.2d at 334 (finding the fact that the defendant assigned the plaintiffs to particular

work crews to be indicative of employee status); *Cromwell*, 348 F. App'x at 61 (recognizing that

limited supervision and substantial control over tasks are completed is indicative of independent

contractor status).

Plaintiffs also contend that Honghua America required they work lengthy hours without a

day off, and further required advanced approval for any day off.  (Doc. No. 15-1 ¶ 6; Doc. No.

15-2 ¶ 6.)  When a defendant sets the hours a plaintiff works, it is indicative of employee status.

*See Carrell*, 998 F.2d at 334.  Defendant attempts to argue that the hours worked and the hourly

rate paid are not indicative of employee status because the hours are actually determined by

customer demand.  (Doc. No. 12 at 15–16.)  The Court is not persuaded by this argument.  If

customer needs necessitated substantial manpower, but workers could elect to work as many

hours as they wished, this would be indicative of independent contractor status.  But when a

defendant requires workers to work whatever hours it demands, even if those demands are driven

by customer needs, workers cannot be said to exercise such a degree of control that they stand as

separate economic entities.   *Hopkins*, 545 F.3d at 343.   Thus, if Plaintiffs can prove that

Honghua America controlled their hours, this fact would suggest employee status.   Likewise,

payment at an hourly rate that is non-negotiable is also employee status, and Defendant provides

no authority to the contrary.  *Carrell*, 998 F.2d at 334 (noting that the fact that the defendant paid

welders an "hourly rate that was rarely negotiable" weighed in favor of employee status).

Finally, Plaintiffs represent that they were required to sign agreements promising not to

compete with Honghua America for the two years following the end of their work at Honghua

America.  (Doc. No. 15-1 ¶ 3; Doc. No. 15-2 ¶ 3.)  While Defendant argues that this is not true,

the Court cannot decide this factual dispute.  If Plaintiffs prove that they were barred from competing with Honghua America for fully two years after they completed their work at Honghua America, this would also weigh against concluding that the degree of control factor was indicative of independent contactor status. *Lindsley*, 401 F. App'x at 946 (recognizing that an allegation that the plaintiff was barred for working for anyone else while working for the defendant weighed against independent contractor status, but ultimately finding plaintiff independent contractor where numerous other facts supported the finding).[4]  While the fact that Plaintiffs had their own registered welding businesses and received Form 1099s may lend some support to Defendant's argument that Plaintiffs were in, in fact, separate economic entities,[5] far too many issues of material fact remain, preventing the Court from determining what status the degree of control factor indicates.

### 2.  Relative Investments

"In applying the relative-investment factor, [courts] compare each worker's *individual* investment to that of the alleged employer." *Hopkins*, 545 F.3d at 344 (citing *Express Sixty-Minutes*, 161 F.3d at 304) (emphasis in original).  In analyzing this factor, courts consider "the

---

[4] Defendant insinuates that the Court may disregard the allegations that Plaintiffs make regarding non-compete agreements because they have failed to produce any such agreements, and that these agreements are subject to the statute of frauds. (Doc. No. 19 at 3.)  However, Plaintiffs are not seeking to recover under the contracts.  Defendant has not cited any authority for the proposition that a party may prove the existence of a contract it is not seeking to recover under only by producing it.  Furthermore, Plaintiffs provide an explanation for why they have not produced the contracts: they state that they do not recall whether they were provided with copies of these agreements.  (Doc. No. 15-1 ¶ 3; Doc. No. 15-2 ¶ 3.)  Accordingly, the Court finds that whether or not Plaintiffs were required to sign non-compete agreements is a factual dispute it may not resolve on summary judgment.

[5] The Court notes that the case law Defendant cites in support of the relevance of the Form 1099s is from the Seventh Circuit.  *See Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 568 (7th Cir. 2009); *E.E.O.C. v. North Knox School Corp.*, 154 F.3d 744, 750 (7th Cir. 1998).  The Seventh Circuit considers a number of additional factors in determining employee status, including the method of payment. *Suskovich*, 553 F.3d at 568.  It was in analyzing this factor that the Seventh Circuit found relevant the fact that Form 1099s were issued. *Id.*; *North Knox*, 154 F.3d at 750.  Defendant neither acknowledges this fact, nor explains why it should be relevant to a determination of degree of control.  The Court need not decide, however, at this time, what relevance, if any, the issuance of Form 1099s has on the degree of control factor.  It suffices to note that, whatever the relevance of this fact, too many other disputes remain for the Court to evaluate the degree of control factor.

amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault*, 612 F.3d at 847; *see also Carrell*, 998 F.2d at 333.

Here, Plaintiffs contend that Honghua America provided them with all of the tools and equipment they needed to do their jobs.  (Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)  Defendant, on the other hand, represents that Plaintiffs were required to bring their own welding equipment to work.   (Doc. No. 12-4 ¶ 11.)   The Fifth Circuit has previously indicated that substantial equipment-related expenditures by welders and splicers suggested that welders and splicers were independent contractors.  *Thibault*, 612 F.3d at 847–48; *see also Carrell*, 998 F.2d at 333.  The Fifth Circuit has also considered the extent to which plaintiffs were compensated for providing their own equipment.  *See Robicheaux*, 697 F.2d at 666 (upholding district court's finding of employee status, and noting that, "[a]lthough each of the welders had invested his own money in purchasing a welding machine, the district court concluded that a relatively minor portion of the compensation was paid to the employees based upon their furnishing their equipment and that the major part of the compensation was paid for the services of these reliable, always on call, experienced employees").  Here, the Court cannot evaluate any of these considerations because the parties dispute whether Plaintiffs were responsible for bringing their own equipment, and present no evidence of how much Plaintiffs expended on any alleged equipment.  Accordingly, the Court cannot determine whether the relative investment factor is indicative of employee status or independent contractor status.

### 3.    Worker's Opportunity for Profit and Loss

The Court next considers who "controlled the major determinants of the amount of profit which the worker could make."  *Hopkins*, 545 F.3d at 344 (citing *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1313 (5th Cir. 1976)) (quotations omitted).  In *Carrell*, the Fifth Circuit

found the fact that the defendant controlled the welders' hours of work and hourly rate was indicative of the defendant's control over the welders' profits.  *Carrell*, 998 F.2d at 333–34. However, the *Carrell* Court also recognized that, other factors, such as the fact that welders could control their own costs and worked for other companies suggested the plaintiffs retained the opportunity to control their profits and losses.  *Id.*

Here, there appears to be no disagreement that Plaintiffs' work hours were determined by Defendant.  (*See* Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)  Although Defendant contends that its labor needs were tied to customer orders (*see* Doc. No. 12-5 ¶ 6; Doc. No. 12-4 ¶¶ 4, 6), it does not dispute that it set Plaintiffs' hours.  This suggests that Plaintiffs lacked at least some control over their opportunities for profit and loss.  *See Carrell*, 998 F.2d at 333–34.  Furthermore, where a defendant sets a schedule that precludes other work, this also weighs against finding that the plaintiffs control their own opportunities for profit and loss.  *See Cromwell*, 348 F. App'x at 61 (recognizing that "[a]lthough it does not appear that [the plaintiffs] were actually prohibited from taking other jobs while working for [the defendants], as a practical matter the work schedule establish by [the defendants] precluded significant extra work").  Here, Plaintiffs worked for Defendant for at least ten months, and Defendant allegedly required Plaintiffs to work twelve hours a day, every day of the week, unless they had advance approval for a day off. (Doc. No. 15-1 ¶¶ 1, 6; Doc. No. 15-2 ¶¶ 1, 6; Doc. No. 12-3.)  Additionally, Plaintiffs do allege that they were required to sign contracts agreeing not to work for anyone else.  (Doc. No. 15-1 ¶ 3; Doc. No. 15-2 ¶ 3.)  Although Defendant attacks the veracity of these assertions, as explained *supra* Part III.A.1, the Court cannot resolve such disputes on summary judgment.  If Plaintiffs can prove their factual allegations, a jury could find that Plaintiffs did not control their own opportunities for profit.

There are also disputed facts about the extent to which Plaintiffs could control costs.  For instance, the parties present conflicting accounts about whether Plaintiffs were responsible for their own equipment.  *See supra* Part III.A.2.  Furthermore, the parties dispute whether Plaintiffs were entitled to select whichever insurance provider they wished, or whether Defendant directed them to use a particular insurer.  (*Compare* Doc. No. 15-1 ¶ 5 *and* Doc. No. 15-2 ¶ 5 *with* Doc. No. 19-1, Ex. A ¶ 8.)  *Carrell* suggests that, even if Defendant exercises some power over Plaintiff's profits, Plaintiffs' control over their own costs might be sufficient to tilt this factor in favor of independent contractor status.  *See Carrell*, 998 F.2d at 333–34 (finding welders to be independent contractors despite presence of some factors suggesting that the defendant exerted control over the plaintiffs' opportunities for profit).  Given the evidence presented that is indicative of employee status, and the substantial factual disputes surrounding many of the relevant facts, a jury could conclude that the relative investment factor is indicative of either employee status or independent contractor status.

### 4.   Skill and Initiative

Courts next consider "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status."  *Hopkins*, 545 F.3d at 345 (citing *Usery*, 527 F.2d at 1314).  Unique skills or an ability to exercise significant initiative within the business are indicative of independent contractor status.  *Id.* (citing *Hickey*, 699 F.2d at 752 and *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993)).  However, "routine work which requires industry and efficiency is not indicative of independence and nonemployee status."  *Express Sixty-Minutes*, 161 F.3d at 305 (citing *Usery*, 527 F.2d at 1314).  Furthermore, although "[t]he lack of the requirement of specialized skills is indicative of employee status, the use of special skills is not itself indicative of independent contractor status, especially if the workers do

not use those skills in any independent way." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998) (citing *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) and *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1295 (3d Cir. 1991)).  The Fifth Circuit has recognized that welding can, but does not always, require specialized skills.  *See Carrell*, 998 F.2d at 333 ("Pipe welding, unlike other types of welding, requires specialized skills.").

Here, as with the previous factors, factual disputes preclude the Court from determining whether the skill and initiative factors weigh in favor of independent contractor status. Defendant provides sworn testimony that Plaintiffs were among the most skilled welders working at Honghua America at any given time, and that Plaintiffs performed little manual work, focusing instead on supervising lower-skilled welders and working with customers to modify projects as needed.  (Doc. No. 19-1, Ex. B ¶¶ 2–5.)  Plaintiffs, on the other hand, contend that they performed work that was manual in nature, were provided with plans to follow, and were closely supervised by a manager who checked their welds.  (*See* Doc. No. 15-1 ¶ 6; Doc. No. 15-2 ¶ 6.)  Defendant is correct that the mere existence of specifications is entirely consistent with contractor status.  *See Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 672 (D. Md. 2000); *Jaworski v. Master Hand Contractors, Inc.*, No. 09 C 07255, 2013 WL 1283534, at *3 (N.D. Ill. Mar. 27, 2013).[6]  Here, however, Plaintiffs' affidavits allege that Defendant did more than merely set minimum standards.  Rather, Plaintiffs' affidavits indicate that they performed primarily low-skilled or unskilled manual labor under close supervision.

---

[6] The case law Defendant cites in support of this point actually analyzes the relevance of specifications under a different factor, the degree of control a defendant has over the manner in which work is performed.  *See Mid-Atlantic Installation*, 164 F. Supp. 2d at 671–72; *Jaworski*, 2013 WL 1283534, at *2–3.  Defendant cites these authorities in support of the skill and initiative factor.  (Doc. No. 19 at 5–6.)  The Court does not decide whether such facts are more appropriately considered under the Fifth Circuit's degree of control factor.  The Court acknowledges that the existence of specifications may have some bearing on the skill and initiative factor and the degree of control factor, and considers it here for the sake of simplicity.

Plaintiffs did receive certain certifications, suggesting that they possess some base level of skill.  (*See* Doc. No. 12-2 at 6–9, 16–17.)  However, the Court, not an expert in the welding industry, cannot discern, from the face of the certifications, what they reveal about Plaintiffs' skill levels.  Defendant does not explain the contents of these certifications, contenting itself with merely pointing out their existence.  (*See* Doc. No. 12 at 10.)  In addition to the uncertain significance of Plaintiffs' certifications, the parties' entirely conflicting account of Plaintiffs' responsibilities prevents the Court from evaluating this factor.[7]

### 5.   Permanency of the Relationship

The final factor courts in the Fifth Circuit typically evaluate is "the permanency of the working relationship."  *Hopkins*, 545 F.3d at 345 (citing *Mr. W Fireworks*, 814 F.2d at 1047).  Some considerations that bear on this factor include the length of the relationship between the parties, whether the worker provides similar services to other companies, and the worker's ability to terminate the relationship.  *Id.*; *Hickey*, 699 F.2d at 752.

Defendant argues that Plaintiffs were independent contractors because they worked for Honghua America on a project-by-project basis.  The Fifth Circuit has recognized that, when a plaintiff's relationship with a defendant is on a project-by-project basis, it is indicative of independent contractor status.  *Cromwell*, 348 F. App'x at 60; *Carrell*, 998 F.2d at 334.  However, here, Plaintiffs dispute ever being told that they were being brought on for a temporary basis, and state that they were advised they would be retained for at least six months, and perhaps a couple of years.  (Doc. No. 15-1 ¶ 2; Doc. No. 15-2 ¶ 2.)  Although Defendant

---

[7] Defendant also argues that Plaintiffs exercised initiative consistent with a finding of independent contractor status. (Doc. No. 12 at 15.)  This argument turns entirely on Defendant's allegations that Plaintiffs worked at Honghua America on a temporary, project-by-project basis, and therefore had to have the initiative to find other assignments. (*Id.*)  However, for the reasons explained *infra* Part III.A.5, factual questions exist about the nature and permanency of the relationship between Plaintiffs and Honghua America.

contends that Plaintiffs were repeatedly advised of start and end dates for all projects (*see* Doc. No. 19-1, Ex. A ¶ 7), the Court cannot resolve this factual dispute.

Perhaps in an attempt to convince this Court that there can be no dispute that Plaintiffs were employed on a project-by-project basis, Defendant points out that Plaintiffs filled out invoices indentifying the specific projects Plaintiffs worked on.  (Doc. No. 12 at 11.)  However, Plaintiffs represent that they filled out "standard timesheets."  (Doc. No. 15-1 ¶ 4; Doc. No. 15-2 ¶ 4.)  The "timesheets" Plaintiffs attach to their Response do contain the label "Invoice" at the top, cutting against their claim that they were provided "standard timesheets."  Nonetheless, the Court cannot, based on this one piece of evidence, conclude that no factual dispute exists as to the nature and permanency of the parties' relationship.  Rather, the jury must consider this evidence, along with the testimony put forward by both parties, and determine whether the permanency of the relationship is indicative of employee status or independent contractor status.

Furthermore, the Fifth Circuit has suggested that, where a plaintiff works for a defendant for ten months, the engagement begins to resemble an employment relationship.  *Robicheaux*, 697 F.2d at 666 (characterizing relationships between plaintiffs and defendant which spanned from ten months to three years as lasting a "substantial period of time"); *see also Lindsley*, 401 F. App'x at 946 (noting that the *Cromwell* splicers worked for their employers for eleven months, similar to the *Robicheaux* welders who worked for the employer for periods ranging from ten months to three years, and unlike the *Carrell* welders who worked annually for the contractor for three to sixteen weeks, and the *Thibault* splicers who worked for the contractor for approximately three months).  Defendant ignores this Fifth Circuit precedent, and instead cites out-of-circuit case law in support of its argument the length of an engagement is not relevant.  (*See* Doc. No. 19 at 7 (citing *North Knox*, 154 F.3d at 750–51).)  While the Court agrees that the

length of the relationship cannot resolve the entire inquiry, the Court cannot agree that it does bear any relevance.  After all, the Fifth Circuit has repeatedly mentioned, in cases involving welders and splicers, the length of the relationship, and used it to distinguish cases from each other.  *See, e.g.*, *Lindsley*, 401 F. App'x at 946 (noting that "[s]imilar to *Thibault*, Lindsley worked for Parker for approximately three months, unlike the eleven month employment in *Cromwell*"); *Cromwell*, 348 F. App'x at 60 (pointing out that "[t]he plaintiffs in this case worked full-time exclusively for the defendants for approximately eleven months, within the time range that the *Robicheaux* welders had worked for the defendant in that case.").  Here, Plaintiffs worked at Honghua America for at least ten months.  (Doc. No. 15-1 ¶¶ 1, 6; Doc. No. 15-2 ¶¶ 1, 6; Doc. No. 12-3.)  This is within the range that the Fifth Circuit has previously found indicative of employee status.[8]  The length of the relationship, and the factual disputes surrounding what Plaintiffs were told about their positions, preclude the Court from deciding, at the summary judgment stage, what status the permanency of the relationship suggests.

### 6.    Other Factors

Because the factors above are non-exhaustive, courts typically consider any other factors the parties argue have bearing on whether a plaintiff is an employee under the FLSA.  *See Hopkins*, 454 F.3d at 346; *Express Sixty-Minutes*, 161 F.3d at 305.  Honghua America makes several other arguments against a finding of employee status.

First, Defendant argues that Plaintiffs are independent contractors because several governmental agencies have declined to conclude that Honghua America's rig welders were

---

[8] Although Defendant does not acknowledge the Fifth Circuit case law specifically considering the length of the relationship, Defendant does argue, as a matter of logic, that the length of Plaintiffs' engagement with Honghua America is irrelevant, because Plaintiffs merely chose to stay on for multiple projects.  (Doc. No. 12 at 14–15.) However, as discussed *supra* Part III.A.5, whether Plaintiffs really worked on a project-by-project basis is disputed. However, if Defendant can prove that Plaintiffs were employed on a project-by-project basis, the Court does not suggest that the sheer length of the relationship would preclude a determination that the permanency of the relationship factor weighs in favor of independent contractor status.  At this stage, however, the length of the relationship is one additional factor weighing against summary judgment.

employees.  (Doc. No. 12 at 5–8.)  It provides Dismissal and Notice of Rights documentation in several discrimination complaints filed with the Equal Employment Opportunity Commission ("EEOC"), which indicate that the EEOC dismissed the complaints for lack of an employer-employee relationship.  (*See generally* Doc. No. 12-7.)  However, these complaints were filed by individuals who are not parties to this lawsuit, and the Court knows nothing about their relationship with Defendant.  Furthermore, they were filed under a different statute.  Defendant provides no authority that a determination of non-employee status under Title VII sheds any light on the inquiry under the FLSA, which includes a particularly expansive understanding of who constitutes an employee.  *See Darden*, 503 U.S. at 326 (recognizing the broad meaning of "employee" under the FLSA).

Defendant also points out that Honghua America had previously been investigated by the Department of Labor ("DOL"), which reviewed its records for all employees.  (Doc. No. 12-4 ¶ 12.)  According to Honghua America, the DOL determined overtime compensation was owed to non-rig welders, but "declined to make a similar finding as to rig welders like these Plaintiffs." (*Id.*)  This argument also fails to persuade the Court that Plaintiffs must therefore be independent contractors.  First, Defendant does not profess that the DOL concluded rig welders were *not* employees; rather, it merely provides that the DOL "declined to determine" that rig welders were employees.  Second, even if the DOL had determined Honghua America's rig welders were independent contractors, Defendant does not cite any authority for what effect, binding, persuasive, or otherwise, such a finding would have on this Court.  The Court declines to grant summary judgment on the question of employee status merely because governmental agencies have not affirmatively determined that Honghua America's rig welders were employees.

Next, Honghua America points out that Plaintiffs signed contracts acknowledging their status as independent contractors, affirmed this status in their tax forms, and have their own businesses.  (Doc. No. 12 at 11.)  Defendant argues these facts reveal Plaintiffs considered themselves contractors.  (*Id.*)  However, "[a] person's subjective opinion that he is a businessman rather than an employee does not change his status." *Hopkins*, 454 F.3d at 346 (citing *Mr. W Fireworks*, 814 F.2d at 1049).  "[F]acile labels . . . are only relevant to the extent that they mirror economic reality." *Id.* (citing *Mr. W Fireworks*, 814 F.2d at 1044).  Thus, while the Fifth Circuit has condoned a district court's consideration of how plaintiffs and defendants perceive their relationship, *see Thibault*, 612 F.3d at 846, such facts are only relevant to the extent they conform to the economic reality of the relationship.  Here, substantial factual disputes exist on all of the factors relevant to the Court's determination of status.  Accordingly, evidence of how Plaintiffs perceived or identified their status cannot warrant summary judgment.

After considering the record, the Court concludes that summary judgment on the question of employee status is inappropriate.  Defendant's Motion for Summary Judgment is **DENIED** as to this issue.

### B.        Highly compensated employee exemption

Defendant argues that, even if Plaintiffs were employees, they are not owed overtime compensation because they were exempt as highly compensated employees.  (Doc. No. 12 at 16–18.)  The FLSA exempts certain employees from its requirement of overtime compensation. However, exemptions to the FLSA's overtime provisions must be "narrowly construed against the employers seeking to assert [them], leaving the employer with the burden of establishing its entitlement to the exemption." *Chicca v. St. Luke's Episcopal Health Sys.*, 858 F. Supp. 2d 777, 783 (S.D. Tex. 2012) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) and *Dole*

*v. Mr. W Fireworks, Inc.*, 889 F.2d 543, 546 (5th Cir. 1989)); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006).

"An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the [FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee. . . ." 29 C.F.R. § 541.601(a). "'Total annual compensation' must include at least $455 per week paid on a salary or fee basis." 29 C.F.R. § 541.601(b). The highly compensated employee exemption does not require courts to engage in a rigorous analysis of the employee's job duties. *See* 29 C.F.R. § 541.601(c) ("A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."). Instead, a court need only find that a highly compensated employee *customarily and regularly* performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(a). The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

Defendant argues that Plaintiffs were exempt as highly compensated employees who customarily and regularly performed the work of executive employees. The FLSA regulations define the term "employee in a bona fide executive capacity" as one who is:

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, . . . exclusive of board, lodging or other facilities;
(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.200(a).  Defendant contends that Plaintiffs customarily and regularly performed the work of executive employees because they worked in a supervisory capacity and oversaw the work of lower-skilled welders.  (Doc. No. 12-4 ¶ 11; Doc. No. 19-1, Ex. B ¶¶ 3–5.)  For the reasons already explained *supra* Part III.A.4, factual disputes exist about Plaintiffs' duties at Honghua America, precluding the Court from finding that Plaintiffs *ever* performed the duties of an executive employee.

However, there is an even more fundamental flaw in Defendant's argument, which neither party recognizes.  To fall under the highly compensated employee exemption, an employee must be paid on a salary or fee basis.  *See* 29 C.F.R. § 541.601(b); *see also Anani v. CVS RX Services, Inc.*, 788 F. Supp. 2d 55, 60–64 (E.D.N.Y. 2011) (recognizing that employees whose pay is deducted for working fewer hours are considered hourly employees, not salaried employees).  Here, Defendant's own evidence makes clear that Plaintiffs were paid on an hourly basis, not on a salaried basis.  (*See* Doc. No. 12-4 ¶ 11 (stating that Defendant paid Plaintiffs based on invoices submitted); Doc. No. 12-3 (indicating that Plaintiffs' compensation turned on the number of hours worked)).  Defendant has not brought forth any evidence that Plaintiffs were paid on a salary basis, and indeed, has actually presented evidence to the contrary.

For the reasons stated above, Defendant's Motion for Summary Judgment on this issue must be **DENIED**.

## IV.     CONCLUSION

For the reasons discussed above, the Court finds that Defendant's Motion for Summary

Judgment (Doc. No. 12) must be **DENIED**.


**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 10th day of June, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE